## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOURTHERN DISTRICT OF FLORIDA

Case No. 08-61411-CIV-MOORE/SIMONTON

PATTIE DEBOSE et al.,

      Plaintiffs,

v.

BROWARD HEALTH,

      Defendant.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS CAUSE came before the Court upon a non-jury trial held on June 22-26, 2009. Plaintiffs Pattie Debose,[1] Kalissa Anderson-Whilby, Euphemia Duncan, Lucille McKinney, Yolonda McDuffie, Damariz Perez, and Mary Glenn-Mitchell contend that, in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201-19 ("FLSA"), Defendant Broward Health ("BH") failed to pay them for work performed during skipped or interrupted meal breaks. Plaintiff McKinney also claims that she regularly performed unpaid overtime work after clocking out at the end of the day. Broward Health maintains that Plaintiffs were properly paid for all hours worked and that it had no actual or constructive knowledge that Plaintiffs worked overtime hours without pay.

Upon the Parties' Joint Stipulation for Bifurcation of the Trial into Liability and

---

[1] The Complaint (dkt #1) and numerous court filings – as well as their time reports (Pls.' Exs. 1D, 6D) – indicate that Ms. Debose's first name is "Pattie" and that Ms. Perez's first name is "Damariz." According to the transcript of their trial testimony, however, Ms. Debose spells her name "P-a-t-t-y" (Trial Tr. Vol. 1: 12) and Ms. Perez spells her name "D-a-m-a-r-i-s" (Trial Tr. Vol. 3: 102). For the sake of consistency, the Court will continue with the spellings used in the Parties' submissions: "Pattie" and "Damariz."

Damages Phases (dkt # 48), the Court determined that the initial trial phase would address the issue of liability and that, if necessary, a subsequent trial phase on the issue of damages would follow.  (Order Bifurcating Trial, dkt # 49.)  As a result, the June 2009 trial was limited to the issue of liability.

UPON CONSIDERATION of the evidence presented, the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A. STIPULATED FACTS

"Plaintiffs were non-exempt employees under the FLSA, who were entitled to overtime pay at the rate of one and one half times their regularly hourly rate." (Joint Pretrial Stipulation (dkt # 35) § 5.I)  "The positions held by Plaintiffs were all clerical and Plaintiffs were not responsible for any patient medical care." (Pretrial Stip. § 5.J)

"From September 2005 through November 2007, Plaintiffs held the following positions within the Patient Access Department at Broward General Medical Center:

> Pattie Debose – Financial Counselor (Job Code 675) and Patient Access Coordinator (Job code 271);
> Lucille McKinney – [Insurance] Verification Specialist (Job Code 279);
> Yolonda McDuffie – Data Quality Coordinator (Job Code 827);
> Damariz Perez – Data Quality Coordinator (Job Code 827);
> Euphemia Duncan – Patient Access Specialist (Job Code 278) and Patient Access Coordinator (Job Code 271);
> Mary Glenn-Mitchell – Financial Counselor (Job Code 675); and
> Kalissa Anderson-Whilby – Patient Access Specialist (Job code 278) and Financial Counselor (Job Code 675)."

(Pretrial Stip. § 5.H)

"Broward Health has a policy requiring employees to be compensated when they work through their meal breaks." (Pretrial Stip. § 5.P)

"In or about November 2007, as a result of an investigation in the Patient Access Department regarding improper email usage and dissemination, all seven (7) of the Plaintiffs were terminated from Broward Health." (Pretrial Stip. § 5.Q)

### B. BH'S MEAL AND OVERTIME POLICIES

The BH employee manual contains a written policy regarding meal breaks and overtime. Under the heading "Work Schedule," the policy states in part:

> Most employment is based on full shifts of 8 or 12 hours worked and a 1/2-hour unpaid, uninterrupted meal period. There are some exceptions and these should be <u>approved in advance by your Supervisor</u>. Your supervisor, based on staffing needs, assigns overtime hours. If you work overtime hours without supervisor approval, you may be subject to disciplinary action.

(Pls.' Ex. 13) (emphasis added) The section entitled "Meal and Rest Periods" contains the following statement: "Your supervisor will schedule meal period according to the facility's procedures to accommodate patient needs or other business requirements. If possible, you will be relieved of all active responsibilities and restrictions during meal periods. If not, you may be eligible for pay." (Pls.' Ex. 14)

As explained in the "Time Record" section of the handbook, "[BH] has an automated time and attendance system accessed via telephone. Non-exempt employees clock in and out from designated telephones at their workstation. . . . Employees will receive in-service training on the time and attendance system during their orientation period." (Pls.' Ex. 15)

In lieu of physical punch cards, employees at BH recorded their time by dialing into the system via telephone. The system was called "T.R.E.C." which stands for Time Recording for Employee Compensation. Employees would enter a numerical code to record – i.e., to clock or "TREC" – their activity. For example, employees would enter a

3

code one to clock in, a code nine to clock out, or a code zero to record a skipped meal. (T.R.E.C. Manual, Pls.' Ex. 10)  An unpaid, thirty-minute meal break was automatically deducted from employee time records for each shift of about five hours or more. Therefore, when an employee worked through a meal break, it was necessary to clock a code zero in order for the time record to accurately reflect that. (Trial Tr. Vol. 1 at 63) Entering a code into the TREC system took about thirty seconds or less.  (Trial Tr. Vol. 1 at 64)

### C. PLAINTIFFS' CLAIMS

The parties presented conflicting testimony as to whether the plaintiffs 1) worked through meal breaks, 2) regularly took meal breaks and 3) were paid for missed meal breaks.  After considering the totality of the evidence and the credibility of each of the witnesses, the Court finds that Plaintiffs have not carried their burden of persuasion and have failed to prove by a preponderance of the evidence that they performed work for which they were not paid.  The Court will address each Plaintiff's claim in turn.

#### 1. Pattie Debose

Pattie Debose worked at BH as a financial counselor and, for some months, as a patient access coordinator. (Trial Tr. Vol. 1 at 14-15)  Debose testified that she was aware that a code zero was to be used whenever she was unable to take a meal break. (Trial Tr. Vol. 1 at 61)  She estimated that between September 2005 and November 2007, she missed one or two meal breaks per week.  (Trial Tr. Vol. 1 at 92)  Debose stated that she generally entered a code zero herself in addition to notifying her supervisor of the missed meal break, unless she forgot to clock the code zero – in which case she would send an email informing her supervisor that she had forgotten.  (Trial Tr. Vol. 1 at 240)

4

She stated that she never noticed that a paycheck was not accurate and knew of no reason to think that she was not given proper credit in such instances. (Trial Tr. Vol. 1 at 243)

Furthermore, Debose did not claim that she was ever pressured by a supervisor not to clock code zeros. Besides explaining that she sometimes simply forgot to clock a code zero, Debose stated that "you wouldn't clock a code zero because you wouldn't want to be disciplined for it." (Trial Tr. Vol. 1 at 221) She also stated that "later on" she was informed that supervisor approval was required to clock a code zero. (Trial Tr. Vol. 1 at 101) However, Debose never pointed to any specific instances when she was pressured not to clock a code zero or otherwise explain why she allegedly feared being disciplined for recording a missed meal. Also, although she claimed to have missed more than the sixteen meal breaks for which she was paid between September 2005 and November 2007 (Trial Tr. Vol. 1 at 134), she was not able to recall any instances in which she was not paid for a missed meal break. She also could not recall ever noticing a discrepancy between the number of meal breaks on her paycheck and the number she had actually taken. (Trial Tr. Vol. 1 at 180)

During the period when Debose was admittedly recording nearly all of her missed meal breaks and before the authorization requirement for overtime and skipped meals was being emphasized, payroll records indicated that Debose still only recorded a missed meal break every other month or so (Pls.' Ex. 1D) – much lower than the estimate of missing one to two breaks per week that she provided in her testimony (Trial Tr. Vol. 1 at 92). This discrepancy undercuts Debose's credibility and suggests that she overstated the number of meal breaks that she missed.

In addition, although Debose estimated that she held the position of patient access

5

coordinator for one month, payroll records indicated that it was actually nearly seven months long – from March 19, 2006 through October 15, 2006. (Trial Tr. Vol. 1 at 200-02) According to Debose, when she was a patient access coordinator, she missed her meal break almost every day, or at least four times per week. (Trial Tr. Vol. 1 at 110-11, 255) However, payroll records indicated that during this period Debose recorded a missed meal break only five times – much lower than the estimate that she provided in her testimony. (Pls.' Ex. 1D) Again, Debose failed to adequately explain why she allegedly worked through so many meal breaks without recording them.

Although Debose initially testified that no one informed her that she was entitled to be paid for interrupted meals breaks (Trial Tr. Vol. 1 at 64-65), she later admitted that she was aware that she was entitled to be paid if she did not receive an uninterrupted, thirty-minute meal break and that she was only unsure whether answering a quick question in the middle of her break constituted an interrupted meal break (Trial Tr. Vol. 1 at 176-77).

The Court finds that Debose has failed to prove that she performed work for which she was not paid.

### 2. Yolonda McDuffie

Yolonda McDuffie initially stated that it was her practice to clock a code zero every time she missed a meal break. (Trial Tr. Vol. 2 at 410) She estimated that when she was assigned to the ER she would only be able to take a meal break one or two days per week. (Trial Tr. Vol. 2 at 425) She also estimated that when she worked in data quality, she would take two to three meal breaks per week – although she later estimated three to four times per week. (Trial Tr. Vol. 2 at 426, 427) According to payroll records,

however, McDuffie recorded a total of twenty-five missed meal breaks between September 2005 and November 2007. (Pls.' Ex. 3D) Although there are a few weeks where she recorded a high number of missed meal breaks, there are large periods with no missed meal breaks (for example, none in October, November, or December 2005) and the averages generally contradict McDuffie's testimony.

Inconsistencies also undermine the veracity of McDuffie's testimony. For instance, McDuffie claimed that Jodi Halpine, her supervisor, once refused to clock a code zero for her when she notified Halpine the day after that she had missed her meal break. (Trial Tr. Vol. 2 at 548) However, McDuffie later stated that Halpine had told her that she was not sure if she could approve the code zero. (Trial Tr. Vol. 2 at 568) Furthermore, at her deposition, McDuffie stated that Halpine had never refused her permission to clock a code zero. (Trial Tr. Vol. 2 at 480-81).

McDuffie claimed that Halpine and Jose Montes DeOca, her supervisor prior to Halpine, told her that she should not enter any more code zeros. (Trial Tr. Vol. 2 at 478-79) However, she later testified that Halpine had told her that if she could not take a lunch break, she should contact a supervisor and let them know, and that Halpine would then clock a code zero for her. (Trial Tr. Vol. 2 at 433) McDuffie stated that Halpine would then inform her that she had entered a code zero on her behalf. (Trial Tr. Vol. 2 at 434)

McDuffie stated that she reviewed her paychecks but could not recall ever noticing a discrepancy between the hours she worked and the hours for which she was paid. (Trial Tr. Vol. 2 at 486) She also stated that she thought her time records were accurate until she learned that they reflected a total of only twenty-five code zeros. (Trial

Tr. Vol. 2 at 566)  McDuffie was never disciplined for clocking a code zero and was never penalized for falling behind in her work. (Trial Tr. Vol. 2 at 483-84, 513)

McDuffie's credibility was hampered by multiple contradictions and the fact that she significantly overestimated the number of skipped meal breaks she had recorded.  In light of the evidence, the Court finds that McDuffie failed to prove that she performed work for which she was not paid.

### 3. Euphemia Duncan

Euphemia Duncan stated that she was told that if she missed a lunch break she should clock a code zero before clocking out for the shift. (Trial Tr. Vol. 2 at 594)  She also stated that prior to Martha Walsh becoming department manager in early 2006, she was not required to obtain authorization to enter a code zero and would do so whenever she missed a meal break. (Trial Tr. Vol. 2 at 616)  Even when she forgot, she would tell DeOca, who would record it for her. (Trial Tr. Vol. 2 at 623)  Duncan initially admitted that she was paid for all missed and interrupted meal breaks prior to September 2006, when Ale Griffin became the ER supervisor. (Trial Tr. Vol. 2 at 655)  However, she later testified that she did miss meal breaks without clocking a code zero before Griffin became her supervisor. (Trial Tr. Vol. 2 at 678)

Duncan estimated that during the end of 2005, she missed three to four meal breaks per week. (Trial Tr. Vol. 2 at 625) According to payroll records, however, Duncan recorded only one code zero from September to December of 2005. (Trial Tr. Vol. 2 at 635, 680; Pls.' Ex. 2D)  After being questioned about this, Duncan admitted that she was not sure whether there was more than one occasion in that period when she had told DeOca that she missed a meal break. (Trial Tr. Vol. 2 at 636)

Duncan claimed that after Walsh became the department manager, DeOca told people that they could no longer clock code zeros. (Trial Tr. Vol. 2 at 626-27) After hearing this, Duncan stated that she would just work through her lunch without being paid. (Trial Tr. Vol. 2 at 628) According to the time records, however, Duncan regularly logged a significant number of code zeros throughout 2006 – for a total of 100 for the year. (Pls.' Ex. 2D)

In addition, although Duncan initially claimed that she was not aware that she could record a code zero for an interrupted meal break (Trial Tr. Vol. 2 at 617-18), during cross examination she admitted that she knew that if she was requested or allowed to perform any work during her meal break then the entire break would be considered as time worked. (Trial Tr. Vol. 2 at 647-48)

Duncan admitted that she was never disciplined or given a hard time for clocking a code zero. (Trial Tr. Vol. 2 at 667) She could not recall when, but stated that at some point a discussion took place in which Griffin and Walsh told her she could not clock any more code zeros. (Trial Tr. Vol. 2 at 667) She said that she would not have clocked a code zero after Griffin and Walsh had told her not to do so, but then stated that she may have clocked some code zeros after that. She also stated that she was told she could not clock a code zero under any circumstances and that there were emails saying you would receive a corrective action if you clocked a code zero. She admitted that she understood that the emails prohibited only unauthorized code zeros and that there would not be corrective action if she clocked a code zero and sent an email to Griffin. She admitted that she had done this on a few occasions. (Trial Tr. Vol. 2 at 669-70)

Although payroll records reflect that Duncan began recording skipped meals at a

9

significantly lower rate beginning in October 2006, in light of the inconsistencies and admissions in her testimony, Duncan failed to demonstrate that this change was the result of failing to record skipped meal breaks – as opposed to actually missing fewer of them. Accordingly, the Court finds that Duncan failed to prove that she performed work for which she was not paid.

### 4. Kalissa Anderson-Whilby

Kalissa Anderson-Whilby worked in the registration area of the ER from September 2005 until February 2007, when she became a financial counselor. (Trial Tr. Vol. 2 at 708) She testified that if she was unable to take a meal break, she knew that she was supposed to contact the coordinator or the supervisor. (Trial Tr. Vol. 2 at 719) She also stated that she was not told she could clock a code zero for an interrupted, as opposed to skipped, meal break. (Trial Tr. Vol. 2 at 715, 719-20)

Whilby estimated that while working in the ER she missed an average of two to three lunch breaks per week. (Trial Tr. Vol. 3 at 7) She testified that when she missed a meal break she would either clock the code zero herself or tell her supervisor, DeOca, who would do it for her. (Trial Tr. Vol. 2 at 727-30) However, she later stated that she would sometimes miss a meal break and not clock a code zero or tell DeOca because she would forget or just want to go home. (Trial Tr. Vol. 3 at 10-11, 64-65) Time records indicated that Whilby recorded only six code zeros between September 2005 and November 2007. (Trial Tr. Vol. 2 at 730-35; Pls.' Ex. 7D) Furthermore, Whilby stated that she never notified anyone at BH regarding being paid for missed meal breaks. (Trial Tr. Vol. 3 at 84-85) Whilby had no reason not to record all of her missed meal breaks – especially prior to Griffin allegedly telling her that she could not clock a zero – but had a

clear financial incentive to do so. In light of her time records, this Court cannot conclude that Whilby was missing an average of two to three meal breaks per week while working in the ER, as she claimed.

Whilby stated that shortly after Walsh came on board, an email was sent out explaining a change in the policy regarding clocking code zeros. Whilby understood that, under the new policy, employees could not clock a code zero without prior authorization. (Trial Tr. Vol. 3 at 5)

Whilby stated that there was no need to stay past the end of her shift as a financial counselor because she could complete her work in an eight-hour shift. (Trial Tr. Vol. 3 at 33) Even when she covered in the ER she was able to make up the work the next day. (Trial Tr. Vol. 3 at 34)

According to Whilby, once Griffin became the ER supervisor, he told her that clocking a code zero was not allowed and that she should "do what you got to do, but you can't do no overtime." (Trial Tr. Vol. 3 at 43-44) Whilby claimed that even after Griffin told her that, she nevertheless clocked out and worked past the end of her shift to finish work. (Trial Tr. Vol. 3 at 45) However, she later admitted that during her deposition she had stated she did not clock out on that occasion. (Trial Tr. Vol. 3 at 46)

Whilby also testified that when Griffin told her that there would be changes and no more code zeros, she understood him to mean that there would be fewer code zeros and not that they would be forbidden. (Trial Tr. Vol. 3 at 88) She also denied having testified during her deposition that Griffin ever told her that she was forbidden from clocking a code zero. (Trial Tr. Vol. 3 at 53)

Whilby testified that she shied away from clocking code zeros once there was a

direct order not to do it. Upon further examination, however, she admitted that the emails did not forbid clocking a code zero but simply required authorization to do so. (Trial Tr. Vol. 3 at 77) She also said that nobody at BH ever refused to clock a code zero for her when asked. (Trial Tr. Vol. 3 at 51)

Considering the inconsistencies and admissions in Whilby's testimony, as well as the totality of the evidence as it relates to her claim, the Court finds that Whilby failed to prove that she performed unpaid work in the form of skipped meal breaks.

### 5. Damariz Perez

During the relevant period, Damariz Perez was employed at BH as a data quality coordinator. (Trial Tr. Vol. 3 at 103). Perez stated that in late 2005, she would be sent to work in the ER about three to four times per week. (Trial Tr. Vol. 3 at 112, 120-22) Although she said that no one ever explained to her how to use a code zero, she later stated that, as of September 2005, she knew what a code zero was and how to use it. (Trial Tr. Vol. 3 at 116-17) She also stated that she missed meal breaks when covering in the ER as well as when working in data quality, but never provided an estimate as to how often. (Trial Tr. Vol. 3 at 120, 126)

Perez stated that one time after January 2006, when she informed DeOca that she had not been able to take her lunch break in the ER, DeOca told her, sorry, no one is allowed to clock a zero. (Trial Tr. Vol. 3 at 123-25) Perez also said that she was never denied authorization from a supervisor to clock a code zero. (Trial Tr. Vol. 3 at 135) She stated that she continued to clock some code zeros after DeOca allegedly told her that nobody could clock a code zero, that she was never disciplined for clocking code zeros, and that she was paid for working through the meal breaks she reported. (Trial Tr.

12

Vol. 3 at 152, 175)

Perez testified that she never clocked a code zero when she worked through her meal breaks in the ER – except that, if she had clocked a code zero, it would have been when she was working a weekend shift. (Trial Tr. Vol. 3 at 122) According to time reports, she recorded a total of five missed meal breaks between September 2005 and November 2007 – including one in October 2005. (Pls.' Ex. 6D) Perez did not explain why she would have regularly not recorded her missed meal breaks – particularly during the period before DeOca allegedly told her that no one was allowed to clock a zero. She was clearly interested in earning additional overtime pay, as evidenced by the fact that she regularly signed up for extra shifts. (Trial Tr. Vol. 3 at 136, 139)

Perez stated that she also missed some meal breaks while working in data quality because her work would get backed up when she covered shifts in the ER. (Trial Tr. Vol. 3 at 126) When data quality fell behind with work, however, the staff was either authorized to work overtime or some days were dropped, and Perez was never disciplined for falling behind in her data quality work. (Trial Tr. Vol. 3 at 159-60)

Perez stated that "they" were telling people you are not allowed to clock a code zero, but when questioned she clarified that the other people were complaining about not being able to take lunch breaks in the ER – and they were not discussing code zeros. (Trial Tr. Vol. 3 at 178) She said that her belief that she could not clock a code zero was based on emails and rumors. (Trial Tr. Vol. 3 at 180) However, she later admitted that she understood that the emails merely stated that authorization was required, which meant informing a supervisor. (Trial Tr. Vol. 3 at 180) Furthermore, Perez stated that she was aware that she had the ability to clock a code zero if she was unable to take an

uninterrupted, thirty-minute meal break. (Trial Tr. Vol. 3 at 156)

The Court finds that Perez has failed to prove that she performed work for which she was not paid.

### 6. Mary Glenn-Mitchell

As of September 2005, Mary Glenn Mitchell worked in the ER. (Trial Tr. Vol. 3 at 215, 227) Around March 2006, she returned to her prior position as a financial counselor in the patient access department. (Trial Tr. Vol. 3 at 215)

Mitchell stated that she "rarely took a lunch break" when working in the ER around the time the new ER opened at the end of 2005. (Trial Tr. Vol. 3 at 229, 236) She stated that she would tell DeOca, her supervisor, when she missed a meal break and would clock a code zero if she remembered. (Trial Tr. Vol. 3 at 231) She also said that all of a sudden DeOca started telling her that she had to call or email DeOca in order to clock a code zero. (Trial Tr. Vol. 3 at 231-32)

Mitchell testified that on one occasion, DeOca told Mitchell that she would not allow her to be paid for a skipped meal because she had not authorized it. Mitchell stated that afterwards, she stopped talking to DeOca about skipping meal breaks because she was tired of going over the same thing. (Trial Tr. Vol. 3 at 234-35) Mitchell, however, apparently did not stop clocking zeros. According to payroll records, they were rather steady from December 2005 up to March 2006, when she left the ER. (Pls.' Ex. 5D) Mitchell clocked eighty-six code zeros between September 2005 and November 2007 – including fourteen in December 2005, thirteen in January 2006, and fifteen in February 2006. (Trial Tr. Vol. 3 at 259-61; Pls.' Ex. 5D) She stated that she was never disciplined for clocking a code zero. (Trial Tr. Vol. 3 at 234).

Mitchell went back to her regular shift as a financial counselor in about March of 2006. (Trial Tr. Vol. 3 at 235)  She stated that once she returned to her financial counselor position, when she missed a meal break she would tell her supervisor, Jodi Halpine. (Trial Tr. Vol. 3 at 243)  She also explained that Halpine would then tell her to leave work early the next day – to cancel out the overtime. (Trial Tr. Vol. 3 at 243)  After Walsh sent out emails about cutting down on overtime, Mitchell began being sent home early whenever she worked overtime (including working through meal breaks). (Trial Tr. Vol. 3 at 248)  Mitchell was working very little overtime at that point. (Trial Tr. Vol. 3 at 249)

Mitchell also stated that she would review her paycheck to make sure that she had been paid for all of her missed meal breaks.  She claimed that she suspected that she was not paid for all of the meal breaks she skipped while Halpine was her supervisor, but could not recall whether she ever asked Halpine about it – and did not speak to anyone else about it. (Trial Tr. Vol. 3 at 247-48)  During her cross-examination, Mitchell stated that whenever she forgot to enter a code zero, she would ask DeOca, who would always enter it. Mitchell said that she confirmed this by reviewing her pay stubs.  She also stated that – aside from the one time DeOca denied a code zero because it was unauthorized – she could not point to a single instance when she told either Halpine or DeOca that she had missed a meal break and a code zero was not entered for her. (Trial Tr. Vol. 3 at 287-88)

Mitchell stated that although there was nothing physically stopping her from clocking a code zero, there was an email saying you could not skip a meal.  Upon further examination, however, she admitted understanding that the email from Walsh (Pls.' Ex.

25) stated only that an employee could not clock a code zero without contacting a supervisor – either before or after clocking the code zero. (Trial Tr. Vol. 3 at 273-74)

The Court finds that Mitchell has failed to prove that she performed work for which she was not paid.

### 7. Lucille McKinney

Lucille McKinney stated that for at least four days per week she would work while she ate her lunch. (Trial Tr. Vol. 3 at 334) She also stated that, for a period, she only clocked a code zero when a supervisor told her to – and not on her own. (Trial Tr. Vol. 3 at 329-39)

McKinney testified that there were times when she clocked out at the end of her scheduled shift (5:00 PM) and continued working off the clock. (Trial Tr. Vol. 3 at 331-33) She stated that she would work off the clock sometimes because she knew that overtime was not allowed – or that she could only work thirty or forty minutes of overtime at the most. (Trial Tr. Vol. 3 at 333)

McKinney stated that after Halpine replaced Betty Johnson as supervisor, Halpine would tell employees at informal meetings and via email that there would be no overtime. (Trial Tr. Vol. 4 at 11) She said that she never asked for permission to clock a code zero and never notified a supervisor that she had worked through a lunch break. She stated that she never thought of doing so. (Trial Tr. Vol. 4 at 21) She stated that she could not recall being informed that meal breaks would be mandatory, but she did recall being told that leaving your desk to take lunch was required. (Trial Tr. Vol. 4 at 22) After hearing this, in early or middle 2007, she stated that she would leave her desk for fifteen minutes just to say she had gotten up and taken a stretch break. (Trial Tr. Vol. 4 at 22)

16

McKinney stated that Joel Scinto, a supervisor, once saw her working off the clock and told her that it was against hospital policy to work off the clock and that she should not be doing it. (Trial Tr. Vol. 4 at 26-27) The next day, her supervisor, Halpine, adjusted McKinney's time record to credit her for the extra work and advised her not to work off the clock and to use better time management to complete her work on time. She also formally disciplined McKinney for working off the clock. (Trial Tr. Vol. 4 at 28-29; Verbal Counseling Record, Def.'s Ex. 47) McKinney claimed that she did not remember receiving the verbal counseling. (Trial Tr. Vol. 4 at 31-32)

McKinney stated that Halpine knew that she continued to work off the clock for five or ten minutes at a time after being disciplined because Halpine could tell when McKinney stopped typing on her computer. (Trial Tr. Vol. 4 at 38) McKinney stated that she also began eating lunch at someone else's desk. (Trial Tr. Vol. 4 at 39) She estimated that she continued to work off the clock for fifteen minutes per day. (Trial Tr. Vol. 4 at 39-40) She also stated that around the time of her October 2006 evaluation, she was working about two hours per day off the clock. (Trial Tr. Vol. 4 at 41) She then stated that she sometimes stayed until 8:30 or 9:00 but usually finished around 7:00 or 7:30. (Trial Tr. Vol. 4 at 45)

McKinney testified that she knew that working off the clock at BH was prohibited and would result in discipline. (Trial Tr. Vol. 4 at 49) She stated that Johnson would sometimes see her working late in her office and sometimes asked her whether she was working late and McKinney would tell her no. (Trial Tr. Vol. 4 at 52)

McKinney's testimony was unlike that of her co-Plaintiffs in that it did not conflict with payroll records or contain numerous inconsistencies. Nonetheless,

17

McKinney's claim that she worked overtime (especially the amount of overtime she claims) is implausible, especially since it was supported almost exclusively by McKinney's own self-serving testimony. Also, although she claimed that insurance authorizations often had to be completed on short deadlines, this testimony was largely refuted by credible testimony to the contrary from Martha Walsh and Jodie Halpine. Thus, McKinney failed to adequately explain why she would allegedly perform so many hours of unpaid, unreported overtime – especially after being formally disciplined for working off the clock, but apparently never being disciplined for not completing her work. Accordingly, the Court finds that McKinney failed to prove that she performed work for which she was not paid.

Furthermore, even if McKinney had proven that she performed unpaid overtime work, she failed to demonstrate that BH had actual or constructive knowledge of such work. Although BH could have done a better job of monitoring the amount of work performed by its employees, it cannot be held liable for an FLSA violation where an employee prevents it from learning about overtime work by actively attempting to deceive BH by performing overtime work without detection.

BH made reasonable efforts to inquire as to McKinney's work hours and enforce its overtime policies, while McKinney actively tried to deceive BH and conceal her overtime work. Halpine formally disciplined McKinney for working off the clock and testified that she walked past McKinney's desk for a period following the incident to ensure that McKinney was not continuing to work off the clock. Meanwhile, McKinney stated that she took multiple steps to hide her unauthorized work. For example, she explained that she told supervisors that she was not working when she actually was and

that she ate lunch at other peoples' desks or left for short breaks around lunchtime in order to make it appear that she took a meal break.

BH made reasonable attempts to monitor her overtime work and enforce its overtime policies. Accordingly, the Court finds that even if McKinney had proven that she performed unpaid overtime work, she failed to demonstrate that BH had actual or constructive knowledge of such work.

## II. CONCLUSIONS OF LAW

Pursuant to the FLSA, "an employer may not employ his employee for a workweek longer than forty hours unless his employee receives overtime compensation at a rate not less than one and a half times his regular rate." Allen v. Bd. of Public Educ. for Bibb County, 495 F.3d 1306, 1314 (11th Cir. 2007) (citing 29 U.S.C. § 207(a)(1)). In order to prevail, Plaintiffs must prove that they were suffered or permitted to work without compensation. "Courts have interpreted this to mean that a FLSA plaintiff must demonstrate that (1) he or she worked overtime without compensation and (2) the [employer] knew or should have known of the overtime work." Id. at 1314-15.

### A. PERFORMANCE OF UNCOMPENSATED OVERTIME WORK

"A person is employed if he or she is suffered or permitted to work." Id. at 1314 (citing 29 U.S.C. § 203(g)). The "reason that the employee performed the work is . . . not relevant." Id. Nor is it relevant whether the employer ever asked the employee to do the work. Id. (citing 29 C.F.R. § 785.11).[2] An employer may not avoid liability by simply

---

[2]     29 C.F.R. § 785.11 provides:

> Work not requested but suffered or permitted is work time. For example, an employee may voluntarily continue to work at the end of the shift. He may be a pieceworker, he may desire to finish an assigned task or he may wish to correct errors, paste work tickets, prepare time reports or other records. The reason is immaterial. The employer knows or has reason to believe that he is continuing to work and the time is working time.

promulgating a policy limiting work hours. See 29 C.F.R. § 785.13.[3]

Notwithstanding this broad definition of work, the Court finds that the totality of the credible evidence fails to establish that Plaintiffs performed overtime work for which they were not paid. Accordingly, Plaintiffs' FLSA claims fail.

In addition, the Court notes that, aside from its minimum wage provisions (which Plaintiffs do not rely upon), the FLSA does not guarantee compensation for non-overtime work hours. Any "gap hours," i.e., work hours not in excess of forty hours per week, are not recoverable under the FLSA's overtime provisions. See Valcho v. Dallas County Hospital District, No. 3:07-CV-1853-D, 2009 WL 2486031, at *6 (N.D. Tex. Aug. 14, 2009). Thus, Plaintiffs could not have recovered for any work performed during skipped meal breaks in weeks where such work would not constitute "overtime" work, i.e., work in excess of forty hours per week.

B. EMPLOYER'S ACTUAL OR CONSTRUCTIVE KNOWLEDGE

Although Plaintiffs' failure to prove that they performed unpaid overtime work precludes their recovery, the following conclusions of law are relevant to the Court's finding that, even if McKinney had proven that she worked unpaid overtime, she failed to demonstrate that BH had actual or constructive knowledge of such work.

"In reviewing the extent of an employer's awareness, a court need only inquire whether the circumstances were such that the employer either had knowledge of overtime hours being worked or else had the opportunity through reasonable diligence to acquire

---

[3]      29 C.F.R. § 785.13 provides:
        [I]t is the duty of the management to exercise its control and see that the work is
        not performed if it does not want it to be performed. It cannot sit back and accept the
        benefits without compensating for them. The mere promulgation of a rule against such
        work is not enough. Management has the power to enforce the rule and must make every
        effort to do so.

knowledge." Reich v. Dep't of Conservation & Nat'l Res., 28 F.3d 1076, 1082 (11th Cir. 1994) (internal quotation marks omitted). "The employer's knowledge is measured in accordance with his duty to inquire into the conditions prevailing in his business." Allen, 495 F.3d at 1319 (quoting Golf King Shrimp Co. v. Wirtz, 407 F.2d 508, 512 (5th Cir. 1969)) (internal quotation marks omitted); see also Reich, 28 F.3d at 1082. Furthermore, an employer "does not rid himself of that duty because the extent of the business may preclude his personal supervision, and compel reliance on subordinates. The cases must be rare where prohibited work can be done and knowledge or the consequences of knowledge avoided." Reich, 28 F.3d at 1082 (quoting Wirtz, 407 F.2d at 512) (internal quotation marks omitted).

Despite an employer's duty to inquire, "[a]n employer must have an opportunity to comply with the provisions of the FLSA." Forrester v. Roth's I.G.A. Foodliner, Inc., 646 F.2d 413, 414-15 (9th Cir. 1981). When an "'employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not [an FLSA] violation.'" Newton v. City of Henderson, 47 F.3d 746 (5th Cir. 1995) (quoting Forrester, 646 F.2d at 414); see also Allen, 495 F.3d at 1319 ("There is no violation of the FLSA where the employee performs uncompensated work but deliberately prevents his or her employer from learning of it."); Brumbelow v. Quality Mills, Inc., 462 F.2d 1324, 1327 (5th Cir. 1972); Gaylord v. Miami-Dade County, 78 F. Supp. 2d 1320, 1325 (S.D. Fla. 1999) ("An employer does not have knowledge of uncompensated overtime when an employee submits time sheets showing such overtime did not occur.").

In Brumbelow, 462 F.2d 1324, the employer required its employees to produce a

minimum number of units per eight-hour day. Any worker who found it necessary to work overtime in order to meet the requirement would be fired. The Court of Appeals for the Fifth Circuit rejected the FLSA claim of a worker who had underreported her work hours for fear of being terminated. Id. at 1326. In doing so, the court noted that many workers were able to meet the requirement and there was "no evidence that the company in any manner encouraged workers to falsely report (unless we were to infer an illegal or improper encouragement from the mere existence of a norm, which we decline to do), and no evidence that it knew or should have known that [the employee], unable to perform up to the employer's standard, was giving false information to conceal that fact in order to hold on to her job." Id. at 1327.

Plaintiffs urge the Court to follow the reasoning and result that the Eleventh Circuit reached in Reich. The Court in Reich found that, once an investigative study was released concluding that employees were routinely working unpaid overtime, the employer had actual knowledge of such overtime work. 28 F.3d at 1083 ("If from no other source, the Department had actual knowledge through the . . . study that unreported overtime during deer hunting season continued to be a substantial problem despite the Department's 1985 written policy prohibiting all such work."). Since the employer thus had "specific knowledge" that its overtime policy was not being followed, the Court concluded that the employer "had a duty to do more than to simply continue to apprise the officers of the policy." Id. The Court also noted that the employer was imputed with knowledge of inconsistencies in reports, which indicated that employees were performing unpaid overtime.

The facts of the case at bar are distinguishable from those presented in Reich.

22

Unlike <u>Reich</u>, there was no study or other reliable evidence demonstrating BH's actual (or constructive) knowledge that employees were routinely working unpaid overtime in violation of its policies. Similarly, unlike the employer in <u>Reich</u>, which "never disciplined anyone" for violating its overtime prohibition, BH formally disciplined McKinney upon discovering that she was working off the clock. Furthermore, although some Plaintiffs' testified that their supervisors were aware of their unpaid, unauthorized overtime, this testimony was contradicted by the testimony of defense witnesses as well as other Plaintiffs, who stated that supervisors had no way of knowing when an employee skipped a meal break without recording it or otherwise notifying someone. In addition, Plaintiffs failed to introduce evidence of anything similar to the inconsistent reports in <u>Reich</u>, such as data or documentation that should have alerted BH that Plaintiffs were working unpaid overtime.

Finally, the Court notes that the burden-shifting analysis articulated by the Supreme Court in <u>Anderson v. Mt. Clemens Pottery Co.</u>, 328 U.S. 680, 687-88 (1946), is not relevant to determining FLSA liability. In <u>Anderson</u>, the Court held that

> where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes . . . an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

<u>Id.</u> at 678-88. The holding of <u>Anderson</u> addresses the degree of certainty with which an FLSA plaintiff must prove his damages. It does not alter an FLSA plaintiff's burden to

demonstrate by a preponderance of the evidence that the defendant violated the terms of the FLSA with regards to the plaintiff's employment. See Santelices v. Cable Wiring, 147 F. Supp. 2d 1313, 1329 (S.D. Fla. 2001) ("[A]lthough the Supreme Court established a standard for awarding damages when the evidence of damages is inexact or imprecise, it did not eliminate the employee's burden to prove that he has in fact performed work for which he was not paid."). The Court essentially stated as much after setting out the burden-shifting analysis:

> [H]ere we are assuming that the employee has proved that he has performed work and has not been paid in accordance with the statute. The damage is therefore certain. The uncertainty lies only in the amount of damages arising from the statutory violation by the employer. . . . It is enough under these circumstances if there is a basis for a reasonable inference as to the extent of the damages.

Id. at 688.

In the present case, because Plaintiffs have failed in their burden to prove they have performed work for which they have not been paid, it is unnecessary to engage in the burden shifting analysis contemplated in Anderson.

Final judgment in favor of Defendant will be entered by separate order in accordance with Federal Rule of Civil Procedure 58.

DONE AND ORDERED in Chambers at Miami, Florida, this /7th day of December, 2009.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc:   All Counsel of Record